**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| BRUCE AND MEREDITH BOONE | ) | Case No. 24-60405 |
| | ) | |
| Joint Debtors. | ) | Chapter 7 |
| | ) | |
| In re: | ) | |
| | ) | |
| WHITE OAK COMMERCIAL FINANCE, LLC | ) | Adv. No. |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| BRUCE S. BOONE, SR. and MEREDITH | ) | |
| BOONE; | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT TO DENY DISCHARGEABILITY OF DEBT

White Oak Commercial Finance, LLC ("White Oak" or "Plaintiff"), in the above-captioned

bankruptcy case, by and through undersigned counsel, hereby files this Complaint against Bruce

Boone, Sr. ("Mr. Boone") and Meredith Boone ("Ms. Boone") (collectively, the "Boones" or

Jeremy S. Friedberg, VSB No. 40228
William F. Moss, VSB No. 99635
**FRIEDBERG PC**
10045 Red Run Boulevard, Suite 160
Baltimore, Maryland 21117
Phone: (410) 581-7400
*jeremy@friedberg.legal*
*william.moss@friedberg.legal*

Jeffrey M. Rosenthal (pro hac vice)
Vincent J. Roldan (pro hac vice)
Christopher T. Zona (pro hac vice)
**MANDELBAUM BARRETT PC**
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
Phone: (973) 736-4600
*jrosenthal@mblawfirm.com*
*vroldan@mblawfirm.com*
*czona@mblawfirm.com*

*Attorneys for White Oak Commercial Finance, LLC*

"Defendants"), pursuant to Federal Rules of Bankruptcy Procedure 4007 and 7001(f), for various causes of action to deny dischargeability of debt pursuant to 11 U.S.C. §§523(a)(2), (4) and (6).

In support of the Complaint, White Oak hereby states and alleges as follows:

## INTRODUCTION

1.     Section 523 of the Bankruptcy Code enumerates several exceptions to discharge for individual debtors for specific debts.

2.     Among those exceptions are: (i) debts "for money … to the extent obtained by: (A) false pretenses, a false representation, or actual fraud" (11 U.S.C. §523(a)(2)(A)); (ii) debts resulting from or relating to "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" (11 U.S.C. §523(a)(4)); and (iii) debts resulting from or relating to "willful and malicious injury by the debtor to another entity or to the property of another entity" (11 U.S.C. §523(a)(6)).

3.     Here, as is described in greater detail below, the Boones have engaged in wrongful and fraudulent conduct that has resulted in their theft of millions of dollars from White Oak— money that was advanced by White Oak to the Boones' corporate entity, JJB D.C., Inc. ("JJB") for its operations.

4.     In total, White Oak has been swindled out of nearly $13 million as well as further amounts that will be determined at trial.

5.     The Boones' debt to White Oak should not be discharged.

## JURISDICTION & VENUE

6.     This Court has jurisdiction over the subject matter of this adversary proceeding under 28 U.S.C. §157 and §1334(b).

7.     This is a core proceeding, as defined by 28 U.S.C. §§157(b)(2)(B), (I) and (J).

8.     Venue is proper in this Court pursuant to 28 U.S.C. §1409(a).

## PARTIES

9.      Plaintiff White Oak is a limited liability company organized under the laws of the State of Delaware with its headquarters and principal place of business located in the State of New York. White Oak is also debtor-in-possession lender to JJB and previously a lender to JJB through a longstanding factoring arrangement.

10.     Mr. Boone is one of the two Joint Debtors in this bankruptcy case. He is an individual residing in the Commonwealth of Virginia. He is also part-owner (51%) of JJB.

11.     Ms. Boone is one of the two Joint Debtors in this bankruptcy case. She is an individual residing in the Commonwealth of Virginia. She is also part-owner (49%) of JJB.

12.     JJB is a non-party corporation incorporated in the District of Columbia with its headquarters and principal place of business located in the District of Columbia. JJB is the Debtor in a Chapter 11 case pending in the U.S. Bankruptcy Court for the District of Columbia Case, No. 23-00214-ELG. The JJB bankruptcy case is currently being administered by Lawrence Katz, as Chapter 11 trustee.

## BACKGROUND

13.     JJB—a company co-owned by the Boones—had a longstanding factoring relationship with White Oak. Indeed, White Oak funded JJB' s operations and payroll for nearly 20 years.

14.     On October 1, 2003, JJB and White Oak's predecessor, Federal National Commercial, Inc. ("FNCI") entered into a Master Factoring Agreement (the "Factoring Agreement"), and other agreements in connection therewith (collectively, the "Factoring Documents").

15.     On February 8, 2018, FNCI merged into White Oak Business Credit, Inc., and White Oak Business Credit, Inc. assumed all FNCI's rights under the Factoring Documents.

16.    On October 1, 2021, White Oak Business Credit, Inc. assigned all its rights and interests under the Factoring Documents to White Oak.

17.    Pursuant to the Factoring Documents, White Oak would factor accounts receivable generated by JJB by purchasing JJB's accounts receivable from JJB at a discount.

18.    For years, White Oak continued to fund JJB's operations in return for these accounts receivable.

19.    Obviously, the money provided to JJB by White Oak was for the express and exclusive purpose of funding operations at JJB such that the company could generate new accounts receivable to be factored.

20.    At some point in late 2022, JJB sought additional credit from White Oak for the purpose of funding, among other things, JJB's payroll.

21.    White Oak, relying on (mis)representations from Mr. Boone, extended the additional credit to JJB, which was secured, in part, by a personal, unconditional guaranty from the Boones.

22.    In August 2023, JJB filed for bankruptcy.

23.    JJB—through Mr. Boone—sought White Oak's continued funding of JJB's operations and payroll into the bankruptcy as its debtor-in-possession lender.

24.    White Oak, in reliance on Mr. Boone's (mis)representations, agreed to do so. White Oak's continued funding was, in part, secured by an affirmation of the Boones' prior personal, unconditional guaranty. That personal, unconditional guaranty has since been distilled to a judgment from the State of New York against the Boones for over $14 million, which has since been domesticated in Appomattox County, Virginia.

25.    Notwithstanding White Oak's efforts, JJB's financial decline continued until White Oak finally refused to continue funding JJB's operations and payroll leading the company to discontinue all operations in late-2023.

### THE BOONES' FRAUDULENT CONDUCT

26.    Unbeknownst to White Oak, beginning several years ago, the Boones had begun to divert funds intended to be used for the operations of JJB to be used for their own investments, expenses, expenditures, family members, and other personal benefits.

27.    The Boones knowingly and intentionally concealed all this information from White Oak to ensure that White Oak continued to pump money into JJB even as the company began to fail.

28.    When the Boones saw the writing on the wall, they diverted large sums of money out of JJB for their personal gain including, but not limited to, taking large cash withdrawals from the company, paying "bonuses" or "gifts" to family members, and diverting funds to other personal expenditures.

29.    As JJB's financial situation reached a critical point, Mr. Boone took it upon himself to concoct a scheme to defraud White Oak out of even more money and boldly ordered JJB employees to commit fraudulent acts.

30.    The Boones' actions were designed with one goal in mind: keep White Oak pouring millions of dollars into JJB while the business was floundering.

31.    In the end, White Oak saw nearly $13 million in funds advanced to JJB for its operations and backed by (what White Oak believed to be) verified accounts receivable disappear and the company collapse completely.

**A.    The Harbor Link Diversion Of Funds.**

32.     Mr. Boone siphoned money meant to be used for JJB's operations to help construct and operate a separate entity, Harbor Link.

33.     In return, Mr. Boone received a personal equity interest of approximately 40%.

34.     This is the same equity interest that the Boones partially liquidated to pay for their counsel in this case and that the Boones continue to possess.

35.     Harbor Link is based in Baltimore, MD, operates primarily in in the mid-Atlantic region, and specializes in the design, construction, and maintenance of conduit infrastructure for the telecommunications industry.

36.     In the years before JJB's bankruptcy, Mr. Boone diverted hundreds of thousands of dollars of JJB's operating funds—funds provided to JJB by White Oak in accordance with the Factoring Documents—to allow him, personally, to purchase a 40% stake in Harbor Link.

37.     Boone also diverted JJB's operating funds and employees to perform work on behalf and/or for the benefit of Harbor Link.

38.     Mr. Boone did this without White Oak's knowledge.

39.     Neither JJB nor White Oak received any benefit, compensation, or reimbursement for this diversion of funds.

40.     Additionally, Mr. Boone secretly negotiated and then sold an exclusive rights contract between JJB and Harbor Link whereby Harbor Link used JJB's employees to perform contract work.

41.     That contract was funded by White Oak's financing, but White Oak received no benefit from it.

42.     Further, by selling the contract for personal gain, Mr. Boone further damaged White Oak by selling away a potential revenue stream that should have continued to benefit White Oak through JJB.

43.     Mr. Boone knowingly and intentionally: (i) diverted money from White Oak to sponsor his own equity stake in Harbor Link; (ii) diverted JJB employees being funded by White Oak to assist Harbor Link in operations which, inevitably, benefitted his equity stake; (iii) diverted proceeds of work performed by JJB employees to himself based on a personally negotiated contract; and (iv) sold a contract belonging to JJB for personal gain which should have benefitted White Oak.

44.     The result of this conduct was significant injury to White Oak in an amount to be determined at trial but in no way less than several hundred thousand dollars.

**B.      Using White Oak's Funding For Personal Expenses.**

45.     The Boones also used money intended for JJB to fund personal expenses and lifestyle.

46.     In the years leading up to JJB's bankruptcy in 2023, Mr. Boone exercised near complete and unfettered control over JJB's funds.

47.     According to those at JJB, the Boones treated JJB as a personal "piggy bank" and anything Mr. Boone demanded was paid for at his request without question.

48.     These expenses were paid out of JJB's bank accounts, including its SECU bank account, and other funds.

49.     Upon information and belief, Mr. Boone used these funds to, among other things, pay his home insurance, automobile insurance, personal utility bills, personal cellular phone bills, as well as other expenses wholly unrelated to JJB's business.

50.     Payments were so regularized that they were made from JJB's accounts using "auto pay" functionality.

51.     Employees in JJB's finance department were expected to "make the money available to be used" by the Boones.

52.     None of these personal expenses were known to or approved by White Oak.

53.     None of these personal expenses provided any benefit to JJB or White Oak.

**C.     <u>Using White Oak's Funding For Family Members' No-Show Jobs.</u>**

54.     Unknown to White Oak at the time, the Boones "hired" numerous family members to "work" for JJB and collect salaries funded by White Oak.

55.     However, these family members never showed up for work and added no value to the company.

56.     This practice continued even after White Oak began to fund JJB's payroll in 2023 though it was deliberately hidden from White Oak.

57.     Upon information and belief, Ms. Boone drew a salary from JJB as an "employee" in addition to her ownership draws, but never served in any employment capacity whatsoever.

58.     Upon information and belief, Brian Boone drew a salary from JJB as an "employee" and was paid a massive "gift" or "bonus" (discussed below) while never working in any substantive capacity for the company.

59.     Upon information and belief, Mr. Boone also may have employed his grandchildren, including Joshua Boone, at JJB in a no-show capacity.

60.     The Boones employed regularly and from time-to-time numerous members of their family at JJB without requiring them to perform any legitimate business or employee functions.

61.     This was just one more way that the Boones were able to siphon money out of JJB which rightfully should have been spent on generating additional revenue for the company (and for White Oak).

**D.     Siphoning Off White Oak's Money For The Boones' Personal Use.**

62.     Each of Mr. Boone and Ms. Boone extracted large sums of money from JJB as "distributions" or "draws" during the years leading up to JJB's bankruptcy in 2023.

63.     This was, of course, in addition to the salaries that each drew from JJB.

64.     Upon information and belief, these "distributions" or "draws" amounted to nearly $100,000 per month for certain periods. And, in fact, Mr. Boone reported incomes of well over $1,000,000 per year for certain of these years as JJB was floundering.

65.     The money removed was, in fact, intended to be used for JJB's operations and, by removing it from the company, the Boones were a substantial contributing factor to JJB's financial collapse and White Oak's loss of $13 million in credit—all of which was unconditionally guaranteed by the Boones and for which White Oak received a judgment from the State of New York for over $14 million.

66.     Once they removed this money from the company, it disappeared as the Boones now claim near-total poverty.

67.     Upon information and belief, and according to former JJB employees, the Boones removed large amounts of from JJB's accounts and stored it in physical safes for use at a later time. Some former JJB employees allege that nearly $2 million in cash may have been removed from JJB and stored in physical safes by the Boones (and maybe others). That money remains unaccounted for.

68.     Upon information and belief, some of this money was used to sponsor the Boones' exorbitant lifestyle that included expensive jewelry and two massively expensive homes located

in Virginia and Florida. These homes have both been foreclosed upon because, without the constant flow of cash from White Oak (through JJB) as their personal financiers, the Boones were not able to afford them.

69.     Upon information and belief, the Boones removed funds from JJB to be used as "gifts" or "bonus" payments to family members. This includes a payment of $332,885.34 made at Mr. Boone's direction to his son, Brian Boone, in or around 2020 or 2021. According to a member of the finance department at the time for JJB, that "gift" or "bonus" was fraudulently booked by JJB as an "investment" in a related company, JJB Federal. There was no operational purpose for that payment, nor did it provide benefit to anyone except Mr. Boone and his son. That money remains unaccounted for.

70.     The Boones also used White Oak's funds to fund their own "charitable" endeavors. This included, specifically, making large "gifts" to Appomattox Christian Academy ("ACA") and/or St. Andrew's Anglican Church a/k/a St. Andrew's Reformed Episcopal Church (the "Church").

71.     The Boones are longtime members of the Church (founded in 2003) and founded ACA (in 2005).

72.     According to JJB employees, the Boones diverted substantial operational funds out of JJB to be used for the benefit of ACA and the Church.

73.     These funds were used to buy and donate buildings and/or property to ACA and/or the Church. Indeed, in 2021 the Boones "gifted" a building to ACA and/or the Church, which was then named "Boone Hall." This was reported by the Times Virginian (*https://www.timesvirginian.com/news/article_a4f32f52-2ded-11ec-991d-179ea7f79f53.html*).

74.    Additionally, the Boones used these funds to pay for ACA's operations and expenses.

75.    Once White Oak's money spigot was turned off, ACA and the Church fell into financial distress and allegedly ceased functions.

76.    White Oak never knew about or sanctioned any of these expenditures.

77.    None of these funds were ever repaid to JJB or White Oak.

78.    None of these expenditures served any legitimate business purpose for JJB.

79.    None of these expenditures benefitted JJB or White Oak in any way.

**E.    Boone's Use Of JJB Funds For His Personal Attorney.**

80.    According to sworn testimony, in 2023, Mr. Boone and Ray Odom ("Odom") made an under-the-table "handshake" agreement to allow Odom to use JJB's facilities for storage to benefit Odom's company, JJB Federal (now, Raocore Technology), in exchange for a payment of $50,000.

81.    This agreement was made during the course of JJB's bankruptcy which was being funded by White Oak.

82.    White Oak was never told of this agreement and never approved it.

83.    The monies paid for the use of JJB's facilities rightfully belonged to White Oak as operational revenue against which White Oak had a lien.

84.    However, the $50,000 never reached JJB's bank accounts.

85.    Instead, that money was: (i) directed by Mr. Boone to be paid into his personal account; (ii) directed by Mr. Boone to be paid directly to a third-party law firm which he engaged to personally represent him in the JJB bankruptcy; or (iii) paid into JJB's account(s) and then directed by Mr. Boone to be paid from said account(s) and to the third-party law firm.

86.     Mr. Boone enjoyed the sole and exclusive benefit of the $50,000 as he used the law firm for at least that amount of personal legal services.

87.     White Oak never knew of or approved the use of funds for Mr. Boone's personal counsel. There is nothing remaining from the $50,000—it was all used by the law firm for Mr. Boone's benefit.

88.     Neither JJB nor White Oak received any benefit from the employment of Mr. Boone's personal legal counsel.

89.     Mr. Boone never repaid or reimbursed the $50,000.

**F.     The Verizon Fraud.**

90.     Beyond the siphoning off of money, Mr. Boone (in concert with Odom, who was JJB's COO at the time) enacted a scheme to defraud White Oak relating to a contract between JJB and Verizon (the "Verizon Contract").

91.     Beginning in late-2022, Mr. Boone and Odom targeted a prime contractor contract with Verizon which was then held by a competitor of JJB, Dynamic Concepts Inc. ("DCI").

92.     At the time, JJB was performing work on the Verizon Contract as a subcontractor. However, if JJB became the prime contractor, the Verizon Contract would be much more lucrative.

93.     In order for JJB to secure the Verizon Contract, it needed White Oak's support as well as additional funding to service the Verizon Contract.

94.     To secure said support and additional funding, Mr. Boone (and Odom) made fraudulent misrepresentations to White Oak about the expected revenues from the Verizon Contract.

95.     They knowingly and fraudulently misrepresented to White Oak that the Verizon Contract would be worth upwards of $20 million per year to JJB when, in fact, the Verizon Contract never produced revenues in that amount for DCI, the previous contract holder.

96.     This fact was known to each of Mr. Boone and Odom at the time they made the misrepresentation to White Oak because JJB had been serving as a subcontractor on the Verizon Contract, so they knew DCI's revenues. Further, JJB employed several former DCI employees who worked on the Verizon Contract while at DCI and who knew that the Verizon Contract was not that lucrative.

97.     However, notwithstanding this knowledge Mr. Boone and Odom substantially and fraudulently inflated the expected revenue from the Verizon Contract.

98.     By fraudulently misrepresenting JJB's expected revenues from the Verizon Contract, they were able to induce White Oak into extending additional financing to pay for JJB's payroll beginning in 2023.

99.     White Oak relied on these misrepresentations of expected receivables from the Verizon Contract—all of which would be factored and belong to White Oak—when it agreed to support the Verizon Contract and extend additional financing.

100.    Once the Verizon Contract was secured and White Oak committed to additional funding, Mr. Boone knew that they would need to "create" sufficient receivables to support their prior misrepresentations and keep White Oak sending money to JJB.

101.    Since Verizon did not allow White Oak access to its payment portal, White Oak substantially, justifiably, and reasonably relied on JJB—and Mr. Boone—to honestly and properly create and submit work invoices that reflected actual work performed in accordance with the Verizon Contract.

102.    White Oak verified work invoices prior to their submission into this payment portal but was wholly reliant on Mr. Boone (and JJB's) honesty.

103.     Mr. Boone enacted this fraud in three different ways.

104.    First, he decided to create invoices for work that had not yet been completed but was to be completed in the future. This would allow him to show immediate receivables against which White Oak would advance money. However, in reality, no such receivables existed at the time of White Oak's advance. This is known as "pre-billing."

105.    Second, he decided to falsely inflate invoices for jobs on the Verizon Contract to try to convince White Oak that certain receivables were far greater than they were. As such, White Oak would advance money against the falsely inflated invoice. However, Verizon would not pay the inflated invoice because they were able to verify how much work was actually performed. This damaged White Oak since it already had advanced the money and was not aware that Verizon was not going to pay the falsely inflated invoice.

106.    Third, he decided to wholly falsify invoices to show White Oak that receivables existed when, in fact, none did. This scheme involved creating a false invoice that was shown to White Oak for verification to induce White Oak's advance of money. However, that invoice was never actually submitted to Verizon.

107.    Since White Oak was providing funding based on verified invoices, these schemes worked to defraud White Oak into continuing to fund JJB's operations and payroll while the invoices they were basing said funding on were not immediately payable, inflated, or entirely false.

**i.    The "Pre-Billing" Scheme.**

108.    Mr. Boone ordered JJB personnel to "pre-bill" work on the Verizon Contract for work that was not yet completed.

109.    To accomplish this "pre-billing," he instructed personnel at JJB to generate invoices for work on the Verizon Contract that had not been completed and would not be completed until some point in the future.

14

110.    These invoices used "real" data from Verizon so the information itself was not falsified.

111.    However, to be clear, the work was not actually completed when the invoices were shown to White Oak for the purpose of securing an advance of payment.

112.    White Oak substantially and reasonably relied on these invoices to advance funds to JJB pursuant to the Factoring Documents.

113.    Believing these invoices were legitimate and for work performed, White Oak believed that they would generate receivables in the immediate term.

114.    White Oak then advanced funds to JJB based on this flow of "pre-billed" invoices.

115.    Thus, White Oak was induced into extending continuous financing to JJB—money that Mr. Boone diverted to himself—because White Oak believed that these would be paid in the immediate term by Verizon.

116.    However, these false invoices were not receivables and, thus, were not paid by Verizon.

117.    Rather, the invoices sat in the Verizon payment portal unpaid unless and until the work was completed and could be verified by Verizon.

118.    White Oak was not aware of this and was intentionally kept in the dark by Mr. Boone.

119.    This fraudulent scheme was first uncovered when JJB's former CFO mentioned the practice during a joint call between White Oak and JJB's management team.

120.    Thereafter, White Oak compared invoices they factored with those that were paid out by Verizon. There were various discrepancies discovered during this process including, among other things, differences in invoice numbers and invoice amounts.

121.     The "pre-billing scheme" damaged White Oak in an amount to be determined at trial.

   **ii.     The "Inflated Invoices" Scheme.**

122.     Mr. Boone also designed and enacted another scheme to have JJB employees fraudulently inflate the Verizon invoices when being shown to White Oak for verification to allow the advance of funds.

123.     The aim of this scheme, once again, was to fraudulently induce White Oak into factoring the inflated invoices and extending financing based on the inflated amount while, at the same time, knowing the invoices were bogus.

124.     The inflated invoices were for "real" jobs, but the amount of work—and receivables generated—was more than Verizon would ever pay.

125.     JJB showed these inflated invoices to White Oak for factoring and then submitted them to Verizon for payment.

126.     White Oak had no reason to doubt or disbelieve the invoices and no way to confirm whether the work alleged to have been done had, in fact, been completed as described.

127.     To the contrary, these inflated invoices suggested to White Oak that, perhaps, Mr. Boone and Odom had been telling the truth when he had told White Oak that the Verizon Contract would bring substantial revenues to support JJB.

128.     Unfortunately for White Oak, this was not the case at all. Instead, these inflated invoices began to be rejected by Verizon which was able to cross-check the invoice amounts with the actual work performed.

129.     The rejections of invoices increased in frequency through 2023 and reached a fever pitch in the summer of 2023. Indeed, JJB's billing coordinator for the Verizon Contract became concerned about the volume of rejected invoices because she had a longstanding relationship with

Verizon and felt that the rejections were reflecting poorly on her. But when she asked questions about the invoices, she was removed from her role and the invoice submission role was given to someone who would not ask questions.

130.    The effect of this fraudulent scheme was similar to the "pre-billing" scheme. Namely, it fraudulently induced White Oak to factor receivables based on inflated invoices and extend more financing to JJB than it would ever be able to recover.

131.    Unbeknownst to White Oak, Verizon did not pay the full amount of these inflated invoices because they recognized the inflated amounts, but it was already too late for White Oak because it had advanced funds based on prior misrepresentations.

132.    All the while, money being put into JJB was being diverted out of it by the Boones to themselves and family members.

**iii.    The "Fraudulent Invoices" Scheme.**

133.    The most aggressive scheme that Mr. Boone designed to defraud White Oak was to falsify entire invoices.

134.    According to several employees of JJB, employees were instructed to create entirely false invoices for the Verizon Contract.

135.    Those invoices were shown to White Oak in order to be verified in live video conferences so that White Oak could verify its advance of funds was based on "real" invoices to be submitted for payment.

136.    However, at the direction of Mr. Boone, White Oak was shown fraudulent invoices on these videoconferences. Specifically, a "fake" portal was created that replicated the portal used by Verizon to submit invoices.

137.    White Oak was shown falsified information on an invoice as if it were being submitted into this fake portal. But no such invoice actually existed. And no such invoice was ever submitted.

138.    White Oak did not have direct access to Verizon or the payment portal, which Mr. Boone knew.

139.    White Oak, believing a verified invoice existed, then extended funding based on the fraudulent invoice.

140.    This scheme was designed to bleed more funding out of White Oak to ensure that those involved kept getting paid though White Oak would never receive any compensation.

141.    **WHEREFORE**, White Oak seeks damages against the Boones, jointly and severally, for their fraudulent, willful, and malicious conduct and a determination that the Boones' debt to White Oak is not dischargeable under 11 U.S.C. §§523(a)(2), (a)(4), and (a)(6).

## CAUSES OF ACTION

### COUNT I
### Nondischargeability Of Debt Under 11 U.S.C. §523(a)(2)

142.    White Oak repeats and realleges each and every allegation contained in the preceding and succeeding paragraphs as if fully restated here.

143.    Under 11 U.S.C. §523(a)(2), a debt for money or property obtained by "false pretenses, a false representation, or actual fraud" is exempt from discharge in bankruptcy proceedings.

144.    The Boones owe a debt obligation to White Oak in an amount of no less than $13 million.

145.    The Boones' debt obligation is a debt for money or property.

146.    The Boones obtained this money or property by false pretenses, false representations, and actual fraud as has been described herein and including, but not limited to:

i.      Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to fund Mr. Boone's equity stake in Harbor Link;

ii.     Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to pay for the Boones' personal expenses;

iii.    Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to pay the Boones' family members who were not operational employees;

iv.     Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being extracted from JJB and used by the Boones for various personal expenditures;

v.      Deliberately stealing $50,000 intended to be paid to JJB for the use of its facilities—and, thus, subject to White Oak's lien—for Mr. Boone's personal use;

vi.     Falsely representing to White Oak that the Verizon Contract was worth more than its actual worth to induce White Oak's support and increased funding to JJB;

      vii.    Falsely representing to White Oak—directly and through Mr. Boone's directives to employees—that certain work performed on the Verizon Contract had been completed when it had not been to induce White Oak to advance funds (the "pre-billing" scheme);

      viii.    Falsely representing to White Oak—directly and through Mr. Boone's directives to employees—that certain invoices for the Verizon Contract were worth more than they actually were to induce White Oak to advance funds (the "inflated invoices" scheme); and

      ix.    Falsely representing to White Oak—directly and through Mr. Boone's directives to employees—that certain invoices for the Verizon Contract existed when they did not to induce White Oak to advance funds (the "fraudulent invoices" scheme).

147.    This fraudulent conduct was knowing, deliberate, intentional, willful, and malicious.

148.    At all times, the Boones knew their conduct was fraudulent and their representations were false.

149.    This fraudulent conduct was intended to induce White Oak to continue to lend more money to JJB.

150.    White Oak substantially, justifiably and reasonably relied on the misrepresentations made by the Boones to its detriment.

151.    White Oak incurred damages and injury as a direct and proximate result of the Boones' fraudulent conduct.

152.    Pursuant to 11 U.S.C. §523(a)(2), the Boones' fraudulent conduct does not release them from the aforesaid debt obligation owed to White Oak.

153.    **THEREFORE**, White Oak demands judgment in its favor against the Boones that the Boones' debt obligation to White Oak is not dischargeable under 11 U.S.C. §523(a)(2), and such other and further relief as is equitable and just.

<u>**COUNT II**</u>
**Nondischargeability Of Debt Under 11 U.S.C. §523(a)(4)**

154.    White Oak repeats and realleges each and every allegation contained in the preceding and succeeding paragraphs as if fully restated here.

155.    Under 11 U.S.C. §523(a)(4), a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" is exempt from discharge.

156.    The Boones owe a debt obligation to White Oak in an amount of no less than $13 million.

157.    The obligation of the Defendant to Plaintiff is a debt  so as to bring the debt within the exemption of 11 U.S.C. §523(a)(4)

158.    The Boones' debt obligation exists as a result of "fraud or defalcation" incurred while the Boones were "acting in a fiduciary capacity" for JJB and in privity of contract with White Oak.

159.    The Boones' conduct has been described herein and includes, but is not limited to:

i.      Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to fund Mr. Boone's equity stake in Harbor Link;

ii.     Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to pay for the Boones' personal expenses;

21

iii.    Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to pay the Boones' family members who were not operational employees;

iv.    Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being extracted from JJB and used by the Boones for various personal expenditures;

v.    Deliberately stealing $50,000 intended to be paid to JJB for the use of its facilities—and, thus, subject to White Oak's lien—for Mr. Boone's personal use;

vi.    Falsely representing to White Oak that the Verizon Contract was worth more than double its actual worth to induce White Oak's support and increased funding to JJB;

vii.    Falsely representing to White Oak—directly and through Mr. Boone's directives to employees—that certain work performed on the Verizon Contract had been completed when it had not been to induce White Oak to advance funds (the "pre-billing" scheme);

viii.    Falsely representing to White Oak—directly and through Mr. Boone's directives to employees—that certain invoices for the Verizon Contract were worth more than they actually were to induce White Oak to advance funds (the "inflated invoices" scheme); and

ix.  Falsely representing to White Oak—directly and through Mr. Boone's directives to employees—that certain invoices for the Verizon Contract existed when they did not to induce White Oak to advance funds (the "fraudulent invoices" scheme).

160. This fraudulent conduct was knowing, deliberate, intentional, willful, and malicious.

161. At all times, the Boones knew their conduct was fraudulent and their representations were false.

162. This fraudulent conduct was intended to induce White Oak to continue to lend more money to JJB.

163. White Oak substantially, justifiably and reasonably relied on the misrepresentations made by the Boones to its detriment.

164. White Oak incurred damages and injury as a direct and proximate result of the Boones' fraudulent conduct.

165. Pursuant to 11 U.S.C. §523(a)(4), the Boones' fraudulent conduct does not release them from the aforesaid debt obligation owed to White Oak.

166. **THEREFORE**, White Oak demands judgment in its favor against the Boones that the Boones' debt obligation to White Oak is not dischargeable under 11 U.S.C. §523(a)(4), and such other and further relief as is equitable and just.

## <u>COUNT III</u>
### Nondischargeability Of Debt Under 11 U.S.C. §523(a)(6)

167. White Oak repeats and realleges each and every allegation contained in the preceding and succeeding paragraphs as if fully restated here.

168. Under 11 U.S.C. §523(a)(6), a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity" is exempt from discharge.

169.    The Boones owe a debt obligation to White Oak in an amount of no less than $13 million.

170.    The Boones' debt obligation stems from their willful and malicious conduct which caused injury to White Oak and White Oak's property.

171.    The Boones' conduct has been described herein and includes, but is not limited to:

    i.    Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to fund Mr. Boone's equity stake in Harbor Link;

    ii.    Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to pay for the Boones' personal expenses;

    iii.    Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to pay the Boones' family members who were not operational employees;

    iv.    Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being extracted from JJB and used by the Boones for various personal expenditures;

    v.    Deliberately stealing $50,000 intended to be paid to JJB for the use of its facilities—and, thus, subject to White Oak's lien—for Mr. Boone's personal use;

vi.     Falsely representing to White Oak that the Verizon Contract was worth more than double its actual worth to induce White Oak's support and increased funding to JJB;

vii.     Falsely representing to White Oak—directly and through Mr. Boone's directives to employees—that certain work performed on the Verizon Contract had been completed when it had not been to induce White Oak to advance funds (the "pre-billing" scheme);

viii.     Falsely representing to White Oak—directly and through Mr. Boone's directives to employees—that certain invoices for the Verizon Contract were worth more than they actually were to induce White Oak to advance funds (the "inflated invoices" scheme); and

ix.     Falsely representing to White Oak—directly and through Mr. Boone's directives to employees—that certain invoices for the Verizon Contract existed when they did not to induce White Oak to advance funds (the "fraudulent invoices" scheme).

172.    This fraudulent conduct was knowing, deliberate, intentional, willful, and malicious.

173.    At all times, the Boones knew their conduct was fraudulent and their representations were false.

174.    This fraudulent conduct was intended to induce White Oak to continue to lend more money to JJB.

175.    White Oak substantially, justifiably and reasonably relied on the misrepresentations made by the Boones to its detriment.

176.    White Oak incurred damages and injury as a direct and proximate result of the Boones' fraudulent conduct.

177.    The Boones' fraudulent conduct was willful and malicious and caused injury to White Oak and White Oak's property so, pursuant to 11 U.S.C. §523(a)(6), the Boones cannot be released from the aforesaid debt obligation owed to White Oak.

178.    **THEREFORE**, White Oak demands judgment in its favor against the Boones that the Boones' debt obligation to White Oak is not dischargeable under 11 U.S.C. §523(a)(6), and such other and further relief as is equitable and just.

## COUNT IV
### Fraud

179.    White Oak repeats and realleges each and every allegation contained in the preceding and succeeding paragraphs as if fully restated here.

180.    The Boones' conduct has been described herein and includes, but is not limited to:

  i.    Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to fund Mr. Boone's equity stake in Harbor Link;

  ii.    Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to pay for the Boones' personal expenses;

  iii.    Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being

used to pay the Boones' family members who were not operational employees;

iv.    Falsely representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being extracted from JJB and used by the Boones for various personal expenditures;

v.    Deliberately stealing $50,000 intended to be paid to JJB for the use of its facilities—and, thus, subject to White Oak's lien—for Mr. Boone's personal use;

vi.    Falsely representing to White Oak that the Verizon Contract was worth more than double its actual worth to induce White Oak's support and increased funding to JJB;

vii.    Falsely representing to White Oak—directly and through Mr. Boone's directives to employees—that certain work performed on the Verizon Contract had been completed when it had not been to induce White Oak to advance funds (the "pre-billing" scheme);

viii.    Falsely representing to White Oak—directly and through Mr. Boone's directives to employees—that certain invoices for the Verizon Contract were worth more than they actually were to induce White Oak to advance funds (the "inflated invoices" scheme); and

ix.    Falsely representing to White Oak—directly and through Mr. Boone's directives to employees—that certain invoices for the Verizon Contract

existed when they did not to induce White Oak to advance funds (the "fraudulent invoices" scheme).

181.    This fraudulent conduct was knowing, deliberate, intentional, willful, and malicious.

182.    At all times, the Boones knew their conduct was fraudulent and their representations were false.

183.    This fraudulent conduct was intended to induce White Oak to continue to lend more money to JJB.

184.    White Oak substantially, justifiably and reasonably relied on the misrepresentations made by the Boones to its detriment.

185.    White Oak incurred damages and injury as a direct and proximate result of Defendants' fraudulent conduct.

186.    **THEREFORE**, White Oak demands judgment against the Boones, jointly and severally, for compensatory and punitive damages, together with attorneys' fees, costs of suit and such other and further relief as is equitable and just.

## <u>COUNT V</u>
### Negligent Misrepresentation

187.    White Oak repeats and realleges each and every allegation contained in the preceding and succeeding paragraphs as if fully restated here.

188.    The Boones' conduct has been described herein and includes, but is not limited to:

i.    Representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to fund Mr. Boone's equity stake in Harbor Link;

ii.    Representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to pay for the Boones' personal expenses;

iii.   Representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being used to pay the Boones' family members who were not operational employees;

iv.    Representing to White Oak that operational funds advanced to JJB were being used for JJB's operations when, in fact, those funds were being extracted from JJB and used by the Boones for various personal expenditures;

v.     Omitting and concealing from White Oak that $50,000 intended to be paid to JJB for the use of its facilities—and, thus, subject to White Oak's lien—was used by Mr. Boone for his personal counsel;

vi.    Representing to White Oak that the Verizon Contract was worth more than double its actual worth to induce White Oak's support and increased funding to JJB;

vii.   Representing to White Oak—directly and through Mr. Boone's directives to employees—that certain work performed on the Verizon Contract had been completed when it had not been to induce White Oak to advance funds (the "pre-billing" scheme);

viii.  Representing to White Oak—directly and through Mr. Boone's directives to employees—that certain invoices for the Verizon Contract were worth

more than they actually were to induce White Oak to advance funds (the "inflated invoices" scheme); and

ix.    Representing to White Oak—directly and through Mr. Boone's directives to employees—that certain invoices for the Verizon Contract existed when they did not to induce White Oak to advance funds (the "fraudulent invoices" scheme).

189.    The Boones knew or should have known that their conduct was fraudulent and their representations and omissions were material and false.

190.    The Boones conduct was intended to induce White Oak to continue to lend more money to JJB.

191.    White Oak substantially, justifiably and reasonably relied on the misrepresentations made by the Boones to its detriment.

192.    White Oak incurred damages and injury as a direct and proximate result of the Boones' conduct.

193.    **THEREFORE**, White Oak demands judgment against the Boones, jointly and severally, for compensatory and punitive damages, together with attorneys' fees, costs of suit and such other and further relief as is equitable and just.

## COUNT VI
### Conversion

194.    White Oak repeats and realleges each and every allegation contained in the preceding and succeeding paragraphs as if fully restated here.

195.    White Oak advanced certain monies to JJB for the sole and exclusive purpose of supporting and funding JJB's operations, including its payroll.

196.   White Oak had a legal, enforceable right to accounts receivable generated by certain of JJB's operations.

197.   White Oak had a legal, enforceable right to all other assets of JJB as security for its lending facility.

198.   The Boones intentionally interfered with Plaintiff's possession of this property by engaging in the conduct described herein and including, but not limited to:

    i.    Converting White Oak's funds to fund Mr. Boone's equity stake in Harbor Link;

    ii.    Converting White Oak's funds to pay for the Boones' personal expenses;

    iii.    Converting White Oak's funds to pay the Boones' family members who were not operational employees;

    iv.    Converting White Oak's funds for various personal expenditures;

    v.    Converting $50,000 intended to be paid to JJB for the use of its facilities—and, thus, subject to White Oak's lien—to be used by Mr. Boone for his personal counsel; and

    vi.    Interfering with accounts receivable owed to White Oak from the Verizon Contract through the "pre-billing" scheme, "inflated invoices" scheme, and "fraudulent invoices" scheme.

199.   The Boones' conduct is the direct and proximate cause of White Oak's loss of property.

200.   **THEREFORE**, White Oak demands judgment against the Boones, jointly and severally, for compensatory and punitive damages, together with attorneys' fees, costs of suit and such other and further relief as is equitable and just.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, for the foregoing reasons and based on the foregoing allegations, Plaintiff White Oak Commercial Finance, LLC demands judgment against Defendant Bruce S. Boone, Sr. and Defendant Meredith Boone, jointly and severally, as follows:

A.    As and for **Count I**, judgment declaring that Defendants' debt obligation owed to Plaintiff is nondischargeable under 11 U.S.C. §523(a)(2);

B.    As and for **Count II**, judgment declaring that Defendants' debt obligation owed to Plaintiff is nondischargeable under 11 U.S.C. §523(a)(4);

C.    As and for **Count III**, judgment declaring that Defendants' debt obligation owed to Plaintiff is nondischargeable under 11 U.S.C. §523(a)(6);

D.    As and for **Count IV**, judgment and compensatory damages against Defendants, jointly and severally, for fraud;

E.    As and for **Count V**, judgment and compensatory damages against Defendants, jointly and severally, for negligent misrepresentation;

F.    As and for **Count VI**, judgment and compensatory damages against Defendants, jointly and severally, for conversion;

G.    Awarding Plaintiff punitive damages;

H.    Awarding Plaintiff attorneys' fees and costs; and

I.    Awarding all such other and further relief as is equitable and just.

Dated: December 30, 2024                    Respectfully submitted,

*/s/ Jeremy S. Friedberg*

Jeremy S. Friedberg, VSB No. 40228
William F. Moss, VSB No. 99635
**FRIEDBERG PC**
10045 Red Run Boulevard, Suite 160
Baltimore, Maryland 21117
Phone: (410) 581-7400
*jeremy@friedberg.legal*
*william.moss@friedberg.legal*

-and-

*/s/ Chrisopher T. Zona*

Jeffrey M. Rosenthal (*pro hac vice*)
Vincent J. Roldan (*pro hac vice*)
Christopher T. Zona (*pro hac vice*)
**MANDELBAUM BARRETT PC**
3 Becker Farm Road, Suite 105
Roseland, New Jersey 07068
Phone: (973) 736-4600
*jrosenthal@mblawfirm.com*
*vroldan@mblawfirm.com*
*czona@mblawfirm.com*

***Counsel to White Oak Commercial Finance, LLC***